(Slip Opinion) OCTOBER TERM, 2007 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## REGALADO CUELLAR *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 06–1456.　Argued February 25, 2008—Decided June 2, 2008

Arrested after a search of the car he was driving through Texas toward Mexico revealed nearly $81,000 bundled in plastic bags and covered with animal hair in a secret compartment under the rear floorboard, petitioner was charged with, and convicted of, attempting to transport "funds from a place in the United States to . . . a place outside the United States . . . knowing that the . . . funds . . . represent the proceeds of . . . unlawful activity and . . . that such transportation . . . is designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of " the money, in violation of the federal money laundering statute, 18 U. S. C. §1956(a)(2)(B)(i).　Affirming, the Fifth Circuit rejected as inconsistent with the statutory text petitioner's argument that the Government must prove that he attempted to create the appearance of legitimate wealth, but held that his extensive efforts to prevent the funds' detection during transportation showed that he sought to conceal or disguise their nature, location, source, ownership, or control.

*Held:* Although §1956(a)(2)(B)(i) does not require proof that the defendant attempted to create the appearance of legitimate wealth, neither can it be satisfied solely by evidence that the funds were concealed during transport.　The statutory text makes clear that a conviction requires proof that the transportation's purpose—not merely its effect—was to conceal or disguise one of the listed attributes: the funds' nature, location, source, ownership, or control.　Pp. 5–17.

　(a) The statute contains no "appearance of legitimate wealth" requirement.　Although petitioner is correct that taking steps to make funds appear legitimate is the common meaning of "money laundering," this Court must be guided by a statute's words, not by its title's common meaning, to the extent they are inconsistent, see *Pennsyl-*

*vania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 212. Here, Congress used broad language that captures more than classic money laundering: In addition to concealing or disguising the nature or source of illegal funds, Congress also sought to reach transportation designed to conceal or disguise the funds' location, ownership, or control. Nor does the Court find persuasive petitioner's attempt to infuse a money-laundering requirement into the listed attributes. Only the attribute "nature" is coextensive with the funds' illegitimate character, but that does not mean that Congress intended nature to swallow the other attributes. The Court is likewise skeptical of petitioner's argument that violating the statute's elements would necessarily have the effect of making the funds appear more legitimate than they did before. It is not necessarily true that concealing or disguising any one of the listed attributes may have the effect of making the funds appear more legitimate by impeding law enforcement's ability to identify illegitimate funds. Finally, the Court disagrees with petitioner's argument that §1956(a)(2) must be aimed at something other than merely secretive transportation of illicit funds because that conduct is already punished by the bulk cash smuggling statute, 31 U. S. C. §5332. Even if §1956(a)(2)(B)(i) has no "appearance of legitimate wealth" requirement, the two statutes nonetheless target distinct conduct, in that §5332(a)(1) encompasses, *inter alios*, a defendant who, "with the intent to evade a currency reporting requirement . . . , knowingly conceals more than $10,000 . . . and transports [it] from . . . the United States to a place outside" the country. Pp. 6–9.

(b) The evidence that petitioner concealed the money during transportation is not sufficient to sustain his conviction. In determining whether he knew that "such transportation," §1956(a)(2)(B)(i), was designed to conceal or disguise the specified attributes of the illegally obtained funds, the critical transportation was not the transportation of the funds within this country on the way to the border, but transportation "from a place in the United States to . . . a place outside the United States," *ibid.*—here, from this country to Mexico. Therefore, what the Government had to prove was that petitioner knew that taking the funds to Mexico was "designed," at least in part, to conceal or disguise their "nature," "location," "source," "ownership," or "control." The Court agrees with petitioner that merely hiding funds during transportation is not sufficient to violate the statute, even if substantial efforts have been expended to conceal the money. This conclusion turns on §1956(a)(2)(B)(i)'s text, particularly the term "design," which the dictionaries show means purpose or plan; *i.e.*, the transportation's intended aim. Congress wrote "knowing that such transportation is designed . . . to conceal or disguise" a listed attrib-

ute, and when an act is "designed to" do something, the most natural reading is that it has that something as its purpose. Because the Fifth Circuit used "design" to refer not to the transportation's purpose but to the manner in which it was carried out, its use of the term in this context was consistent with the alternate meaning of "design" as structure or arrangement. It is implausible, however, that Congress intended this meaning. If it had, it could have expressed its intention simply by writing "knowing that such transportation conceals or disguises," rather than the more complex formulation "knowing that such transportation . . . is designed . . . to conceal or disguise." §1956(a)(2)(B)(i). It seems far more likely that Congress intended courts to apply the familiar criminal law concepts of purpose and intent than to focus exclusively on how a defendant "structured" the transportation. In addition, the structural meaning of "design" is both overinclusive and underinclusive: It would capture individuals who structured transportation in a secretive way but lacked any criminal intent (such as a person who hid illicit funds *en route* to turn them over to law enforcement); yet it would exclude individuals who fully intended to move the funds in order to impede detection by law enforcement but failed to hide them during transport.

In this case, evidence that petitioner transported the cash bundled in plastic bags and hidden in a secret compartment covered with animal hair was plainly probative of an underlying goal to prevent the funds' detection during the drive into Mexico. However, even with the abundant evidence that petitioner had concealed the money in order to transport it, the Government's own expert testified that the transportation's purpose was to compensate the Mexican leaders of the operation. Thus, the evidence suggested that the transportation's secretive aspects were employed to *facilitate* it, but not necessarily that secrecy was its *purpose.* Because petitioner's extensive efforts to conceal the funds *en route* to Mexico was the only evidence the Government introduced to prove that the transportation was "designed in whole or in part to conceal or disguise the [funds'] nature, . . . location, . . . source, . . . ownership, or . . . control," petitioner's conviction cannot stand. Pp. 10–17.

478 F. 3d 282, reversed.

THOMAS, J., delivered the opinion for a unanimous Court. ALITO, J., filed a concurring opinion, in which ROBERTS, C. J., and KENNEDY, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–1456

_____

## HUMBERTO FIDEL REGALADO CUELLAR, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 2, 2008]

JUSTICE THOMAS delivered the opinion of the Court.

This case involves the provision of the federal money laundering statute that prohibits international transportation of the proceeds of unlawful activity. Petitioner argues that his conviction cannot stand because, while the evidence demonstrates that he took steps to hide illicit funds *en route* to Mexico, it does not show that the cross-border transport of those funds was designed to create the appearance of legitimate wealth. Although we agree with the Government that the statute does not require proof that the defendant attempted to "legitimize" tainted funds, we agree with petitioner that the Government must demonstrate that the defendant did more than merely hide the money during its transport. We therefore reverse the judgment of the Fifth Circuit.

I

On July 14, 2004, petitioner Humberto Fidel Regalado Cuellar was stopped in southern Texas for driving erratically. Driving south toward the Mexican border, about 114 miles away, petitioner had just passed the town of Eldorado. In response to the officer's questions, petitioner,

who spoke no English, handed the officer a stack of papers. Included were bus tickets showing travel from a Texas border town to San Antonio on July 13 and, in the other direction, from San Antonio to Big Spring, Texas, on July 14. A Spanish-speaking officer, Trooper Danny Nuñez, was called to the scene and began questioning petitioner. Trooper Nuñez soon became suspicious because petitioner was avoiding eye contact and seemed very nervous. Petitioner claimed to be on a 3-day business trip, but he had no luggage or extra clothing with him, and he gave conflicting accounts of his itinerary. When Trooper Nuñez asked petitioner about a bulge in his shirt pocket, petitioner produced a wad of cash that smelled of marijuana.

Petitioner consented to a search of the Volkswagen Beetle that he was driving. While the officers were searching the vehicle, Trooper Nuñez observed petitioner standing on the side of the road making the sign of the cross, which he interpreted to mean that petitioner knew he was in trouble. A drug detection dog alerted on the cash from petitioner's shirt pocket and on the rear area of the car. Further scrutiny uncovered a secret compartment under the rear floorboard, and inside the compartment the officers found approximately $81,000 in cash. The money was bundled in plastic bags and duct tape, and animal hair was spread in the rear of the vehicle. Petitioner claimed that he had previously transported goats in the vehicle, but Trooper Nuñez doubted that goats could fit in such a small space and suspected that the hair had been spread in an attempt to mask the smell of marijuana.

There were signs that the compartment had been recently created and that someone had attempted to cover up the bodywork: The Beetle's carpeting appeared newer than the rest of the interior, and the exterior of the vehicle appeared to have been purposely splashed with mud to cover up toolmarks, fresh paint, or other work. In the

backseat, officers found a fast-food restaurant receipt dated the same day from a city farther north than petitioner claimed to have traveled. After a check of petitioner's last border crossing also proved inconsistent with his story, petitioner was arrested and interrogated. He continued to tell conflicting stories about his travels. At one point, before he knew that the officers had found the cash, he remarked to Trooper Nuñez that he had to have the car in Mexico by midnight or else his family would be "floating down the river." App. 50.

Petitioner was charged with attempting to transport the proceeds of unlawful activity across the border, knowing that the transportation was designed "to conceal or disguise the nature, the location, the source, the ownership, or the control" of the money. 18 U. S. C. §1956(a)(2)(B)(i). After a 2-day trial, the jury found petitioner guilty. The District Court denied petitioner's motion for judgment of acquittal based on insufficient evidence and sentenced petitioner to 78 months in prison, followed by three years of supervised release.

On appeal, a divided panel of the Fifth Circuit reversed and rendered a judgment of acquittal. 441 F. 3d 329 (2006). Judge Smith's majority opinion held that, although the evidence showed that petitioner concealed the money for the purpose of transporting it, the statute requires that the purpose of the transportation itself must be to conceal or disguise the unlawful proceeds. *Id.,* at 333–334. Analogizing from cases interpreting another provision of the money laundering statute, the court held that the transportation must be undertaken in an attempt to create the appearance of legitimate wealth.[1] See *id.,* at

_____

[1] Several Courts of Appeals have considered this requirement as relevant, or even necessary, in the context of 18 U. S. C. §1956(a)(1)(B)(i), which prohibits, *inter alia*, engaging in financial transactions "involv[ing] the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to

334. Although the evidence showed intent to avoid detection while driving the funds to Mexico, it did not show that petitioner intended to create the appearance of legitimate wealth, and accordingly no rational trier of fact could have found petitioner guilty. *Ibid.* Judge Davis dissented, arguing that concealment during transportation is sufficient to violate §1956(a)(2)(B)(i). *Id.,* at 334–336.

The Fifth Circuit granted rehearing en banc and affirmed petitioner's conviction. 478 F. 3d 282 (2007). The court rejected as inconsistent with the statutory text petitioner's argument that the Government must prove that he attempted to create the appearance of legitimate wealth. *Id.,* at 290. But it held that petitioner's extensive efforts to prevent detection of the funds during transportation showed that petitioner sought to conceal or disguise the nature, location, and source, ownership, or control of the funds. *Id.,* at 289–290. Judge Smith dissented for largely the same reasons set forth in his opinion for the original panel majority. He emphasized the distinction

_____

conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of some specified unlawful activity." See *United States* v. *Morales-Rodriguez*, 467 F. 3d 1, 13 (CA1 2006); *United States* v. *Esterman*, 324 F. 3d 565, 572–573 (CA7 2003); *United States* v. *Abbell*, 271 F. 3d 1286, 1298 (CA11 2001); *United States* v. *McGahee*, 257 F. 3d 520, 527–528 (CA6 2001); *United States* v. *Dobbs*, 63 F. 3d 391, 397 (CA5 1995); *United States* v. *Dimeck*, 24 F. 3d 1239, 1247 (CA10 1994).

In construing the provision under which petitioner was convicted, four Courts of Appeals, including the Fifth Circuit, have implicitly or explicitly rejected the requirement. See *United States* v. *Garcia-Jaimes*, 484 F. 3d 1311, 1322 (CA11 2007) (upholding convictions for conspiracy to commit transportation money laundering without addressing the requirement); *United States* v. *Ness*, 466 F. 3d 79, 81–82 (CA2 2006) (rejecting the requirement and upholding a conviction for conspiracy to violate the transportation provision where defendant's conduct was elaborate and highly secretive); *United States* v. *Carr*, 25 F. 3d 1194, 1206–1207 (CA3 1994) (upholding a conviction under the transportation provision without discussing the requirement).

between "concealing something to transport it, and transporting something to conceal it," and explained that whether petitioner was doing the latter depended on whether his ultimate plan upon reaching his destination was to conceal the nature, location, source, ownership, or control of the money. *Id.,* at 296–297.

We granted certiorari, 552 U. S. ___ (2007).

## II

The federal money laundering statute, 18 U. S. C. §1956, prohibits specified transfers of money derived from unlawful activities. Subsection (a)(1) makes it unlawful to engage in certain financial transactions, while subsection (a)(2) criminalizes certain kinds of transportation. Petitioner was charged under the transportation provision: The indictment alleged that he attempted to transport illicit proceeds across the Mexican border "knowing that such transportation was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control" of the funds.[2] App. 10–11 (citing

———————

[2] Subsection (a)(2) reads, in its entirety:

"Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

"(A) with the intent to promote the carrying on of specified unlawful activity; or

"(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

"(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

"(ii) to avoid a transaction reporting requirement under State or Federal law,

"shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transporta-

§1956(a)(2)(B)(i)).

## A

We first consider the "designed . . . to conceal" element. Petitioner argues that to satisfy this element, the Government must prove that the defendant attempted to create the appearance of legitimate wealth. Petitioner would replace "designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds" with "designed to create the appearance of legitimate wealth." §1956(a)(2)(B)(i). This is consistent with the plain meaning of "money laundering," petitioner argues, because that term is commonly understood to mean disguising illegally obtained money in order to make it appear legitimate. In petitioner's view, this common understanding of "money laundering" is implicit in both the transaction and transportation provisions of the statute because concealing or disguising any of the listed attributes would necessarily have the effect of making the funds appear legitimate, and, conversely, revealing any such attribute would necessarily reveal the funds as illicit. The Government disagrees, contending that making funds appear legitimate is merely one way to accomplish money laundering, and that revealing a listed attribute would not necessarily reveal the funds' illicit nature. In any event, the Government argues, the statute should not be cabined to target only classic money laundering because Congress intended to reach any conduct that impairs the ability of law enforcement to find and

_____

tion, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true."

recover the unlawful proceeds.

We agree with petitioner that taking steps to make funds appear legitimate is the common meaning of the term "money laundering." See American Heritage Dictionary 992 (4th ed. 2000) (hereinafter Am. Hert.) (defining "launder" as "[t]o disguise the source or nature of (illegal funds, for example) by channeling through an intermediate agent"); Black's Law Dictionary 1027 (8th ed. 2004) (hereinafter Black's) (defining "money-laundering" to mean "[t]he act of transferring illegally obtained money through legitimate people or accounts so that its original source cannot be traced"). But to the extent they are inconsistent, we must be guided by the words of the operative statutory provision, and not by the common meaning of the statute's title. See *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 212 (1998) (declining to use a statute's title to limit the meaning of the text). Here, Congress used broad language that captures more than classic money laundering: In addition to concealing or disguising the nature or source of illegal funds, Congress also sought to reach transportation designed to conceal or disguise the location, ownership, or control of the funds. For example, a defendant who smuggles cash into Mexico with the intent of hiding it from authorities by burying it in the desert may have engaged in transportation designed to conceal the location of those funds, but his conduct would not necessarily have the effect of making the funds appear legitimate.

Nor do we find persuasive petitioner's attempt to infuse a "classic money laundering" requirement into the listed attributes. Contrary to petitioner's argument, revealing those attributes—nature, location, source, ownership, or control—would not necessarily expose the illegitimacy of the funds. Digging up the cash buried in the Mexican desert, for example, would not necessarily reveal that it was derived from unlawful activity. Indeed, of all the

listed attributes, only "nature" is coextensive with the funds' illegitimate character: Exposing the nature of illicit funds would, by definition, reveal them as unlawful proceeds. But nature is only one attribute in the statute; that it may be coextensive with the creation of the appearance of legitimate wealth does not mean that Congress intended that requirement to swallow the other listed attributes.

We likewise are skeptical of petitioner's argument that violating the elements of the statute would necessarily have the effect of making the funds appear more legitimate than they did before. It is true that concealing or disguising any one of the listed attributes may have the effect of making the funds appear more legitimate—largely because concealing or disguising those attributes might impede law enforcement's ability to identify illegitimate funds—but we are not convinced that this is necessarily so. It might be possible for a defendant to conceal or disguise a listed attribute without also creating the appearance of legitimate wealth. Cf. *United States* v. *Abbell*, 271 F. 3d 1286, 1298 (CA11 2001) (noting that the transaction provision, although designed to punish those who "attemp[t] to legitimize their proceeds," may be satisfied without proof that a particular defendant did so). Petitioner's "appearance of legitimate wealth" requirement simply has no basis in the operative provision's text.

Petitioner argues that the money laundering transportation provision must be aimed at something other than merely secretive transportation of illicit funds because that conduct is already punished by the bulk cash smuggling statute, 31 U. S. C. §5332 (2000 ed., Supp. V). We disagree. A comparison of the statutory language reveals that, even if no "appearance of legitimate wealth" requirement exists in 18 U. S. C. §1956(a)(2)(B)(i), the two statutes nonetheless target distinct conduct. The bulk cash smuggling provision encompasses, in relevant part, a

defendant who,

> "with the intent to evade a currency reporting requirement under section 5316, knowingly conceals more than $10,000 in currency or other monetary instruments . . . and transports or transfers or attempts to transport or transfer such currency or monetary instruments from a place within the United States to a place outside of the United States." 31 U. S. C. §5332(a)(1).

To be sure, certain conduct may fall within both statutes. For example, both provisions may be violated by a defendant who intends to evade a relevant reporting requirement. See §5332(a)(1) (transportation of funds "with the intent to evade a currency reporting requirement"); 18 U. S. C. §1956(a)(2)(B)(ii) (transportation of funds knowing that it is designed "to avoid a transaction reporting requirement"). But only the money laundering statute may be violated in the absence of such intent. See §1956(a)(2)(B)(i) (prohibiting transportation of illicit funds knowing that the transportation is designed to conceal or disguise a listed attribute). Similarly, although both statutes encompass transportation of illicit funds, only the bulk cash smuggling statute also punishes the mere transportation of lawfully derived proceeds.[3] Compare 31 U. S. C. §5332(a) (omitting any requirement that the funds be unlawfully derived) with 18 U. S. C. §1956(a)(2)(B) (requiring that the defendant "kno[w] that the monetary instrument or funds involved in the transportation . . . represent the proceeds of some form of unlawful activity").

--------

[3] Section 1956(a)(2)(A) also punishes the mere transportation of lawfully derived proceeds, but it imposes the additional requirement, not found in 31 U. S. C. §5332 (2000 ed., Supp. V), that the defendant must have "inten[ded] to promote the carrying on of specified unlawful activity."

### B

Having concluded that the statute contains no "appearance of legitimate wealth" requirement, we next consider whether the evidence that petitioner concealed the money during transportation is sufficient to sustain his conviction. As noted, petitioner was convicted under §1956(a)(2)(B)(i), which, in relevant part, makes it a crime to attempt to transport "funds from a place in the United States to . . . a place outside the United States . . . knowing that the . . . funds involved in the transportation . . . represent the proceeds of some form of unlawful activity and knowing that such transportation . . . is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." Accordingly, the Government was required in this case to prove that petitioner (1) attempted to transport funds from the United States to Mexico, (2) knew that these funds "represent[ed] the proceeds of some form of unlawful activity," *e.g.,* drug trafficking, and (3) knew that "such transportation" was designed to "conceal or disguise the nature, the location, the source, the ownership, or the control" of the funds.

It is the last of these that is at issue before us, viz., whether petitioner knew that "such transportation" was designed to conceal or disguise the specified attributes of the illegally obtained funds. In this connection, it is important to keep in mind that the critical transportation was not the transportation of the funds within this country on the way to the border. Instead, the term "such transportation" means transportation "from a place in the United States to . . . a place outside the United States"— here, from the United States to Mexico. Therefore, what the Government had to prove was that petitioner knew that taking the funds to Mexico was "designed," at least in part, to conceal or disguise their "nature," "location,"

"source," "ownership," or "control."

Petitioner argues that the evidence is not sufficient to sustain his conviction because concealing or disguising a listed attribute of the funds during transportation cannot satisfy the "designed . . . to conceal" element. Citing cases that interpret the identical phrase in the transaction provision to exclude "mere spending,"[4] petitioner argues that the transportation provision must exclude "mere hiding." Otherwise, petitioner contends, all cross-border transport of illicit funds would fall under the statute because people regularly make minimal efforts to conceal money, such as placing it inside a wallet or other receptacle, in order to secure it during travel. The Government responds that concealment during transportation is sufficient to satisfy this element because it is circumstantial evidence that the ultimate purpose of the transportation—*i.e.*, its "design"—is to conceal or disguise a listed attribute of the funds. This standard would not criminalize all cross-border transport of illicit funds, the Government argues, because, just as in the transaction cases,[5] the statute encompasses only *substantial* efforts at conceal-

———————

[4] See, *e.g., Esterman*, 324 F. 3d, at 570–572; *United States* v. *Corchado-Peralta*, 318 F. 3d 255, 259 (CA1 2003); *McGahee*, 257 F. 3d, at 527; *United States* v. *Herron*, 97 F. 3d 234, 237 (CA8 1996); *United States* v. *Majors*, 196 F. 3d 1206, 1213 (CA11 1999); *United States* v. *Stephenson*, 183 F. 3d 110, 120–121 (CA2 1999); *Dobbs*, 63 F. 3d, at 398; *United States* v. *Garcia-Emanuel*, 14 F. 3d 1469, 1474 (CA10 1994).

[5] See, *e.g.*, *Ness*, 466 F. 3d, at 81 (concluding that extensive attempts at secrecy were sufficient to support a conviction under 18 U. S. C. §1956(a)(1), but "express[ing] no view" as to whether transactions involving "less elaborate stratagems or a lesser measure of secrecy" would be sufficient); *United States* v. *Johnson*, 440 F. 3d 1286, 1291 (CA11 2006) ("Evidence of concealment must be substantial"); *Dimeck*, 24 F. 3d, at 1247 ("The transportation of the money from Detroit to California in a box, suitcase, or other container does not convert the mere transportation of money into money laundering").

ment.  As a result, the Government agrees with the Court
of Appeals that a violation of the transportation provision
cannot be established solely by evidence that the defen-
dant carried money in a wallet or concealed it in some
other conventional or incidental way.  See 478 F. 3d, at
291 (characterizing the defendant's transportation of
money in a box in *United States* v. *Dimeck,* 24 F. 3d 1239,
1246 (CA10 1994), as a "minimal attempt at concealment"
that is distinguishable from petitioner's "effort to hide or
conceal" the funds).

   We agree with petitioner that merely hiding funds
during transportation is not sufficient to violate the stat-
ute, even if substantial efforts have been expended to
conceal the money.  Our conclusion turns on the text of
§1956(a)(2)(B)(i), and particularly on the term "design."  In
this context, "design" means purpose or plan; *i.e.*, the
intended aim of the transportation.  See Am. Hert. 491
("To formulate a plan for; devise"; "[t]o create or contrive
for a particular purpose or effect"); Black's 478 ("A plan or
scheme"; "[p]urpose or intention combined with a plan");
see also Brief for United States 14 ("'to conceive and plan
out in the mind'" (quoting Webster's Third New Interna-
tional Dictionary 611 (1993)).  Congress wrote "knowing
that such transportation is designed . . . to conceal or
disguise" a listed attribute of the funds, §1956(a)(2)(B)(i),
and when an act is "designed to" do something, the most
natural reading is that it has that something as its pur-
pose.  The Fifth Circuit employed this meaning of design
when it referred to the "transportation design or plan to
get the funds out of this country."  See 478 F. 3d, at 289.

   But the Fifth Circuit went on to discuss the "design" of
the transportation in a different sense.  It described the
packaging of the money, its placement in the hidden com-
partment, and the use of animal hair to mask its scent as
"*aspects* of the transportation" that "were designed to
conceal or disguise" the nature and location of the cash.

*Ibid.* (emphasis added). Because the Fifth Circuit used "design" to refer not to the purpose of the transportation but to the manner in which it was carried out, its use of the term in this context was consistent with the alternate meaning of "design" as structure or arrangement. See Am. Hert. 491, 492 ("To plan out in systematic, usually graphic form"; "[t]he purposeful or inventive arrangement of parts or details"); Black's 478 ("The pattern or configuration of elements in something, such as a work of art"). The Government at times also appears to adopt this meaning of "design." See Brief for United States 21 ("Congress focused on how the transportation itself was 'designed'"); *id.*, at 43 (arguing that petitioner's design to move funds without detection is proof of a design to conceal or disguise the location and nature of the funds).[6] If the statutory term had this meaning, it would apply whenever a person transported illicit funds in a secretive manner. Judge Smith supplied an example of this construction: A petty thief who hides money in his shoe and then walks across the border to spend the money in local bars, see 478 F. 3d, at 301 (dissenting opinion), has engaged in transportation

---

[6] This understanding of "design" is also implicit in some of the Government's statements that secretive transportation is sufficient to prove a violation of the statute. See Brief for United States 46 (arguing that the statute covers any "surreptitiou[s]" movement of funds "to a location where United States law enforcement authorities are impaired from detecting and intercepting them," apparently regardless of whether such impairment was the purpose of the plan); *id.*, at 11 ("When a defendant surreptitiously transports or attempts to transport illegal proceeds across the border knowing of their illegal character, money laundering is the appropriate charge"); *id.*, at 13 ("The statute explicitly covers, and was intended to cover, a wide range of conduct that impairs the ability of law enforcement to find and recover the proceeds of crime"); Tr. of Oral Arg. 46. Agent Richard Nuckles, Immigration and Customs Enforcement (ICE), appears to have adopted this standard at trial as well. See Tr. 196 (Oct. 12, 2004) (testifying that attempting to move funds across the border without detection would be illegal, apparently regardless of the reason for doing so).

designed to conceal the location of the money because he
has hidden it in an unlikely place.

We think it implausible, however, that Congress in-
tended this meaning of "design." If it had, it could have
expressed its intention simply by writing "knowing that
such transportation conceals or disguises," rather than the
more complex formulation "knowing that such transporta-
tion . . . is designed . . . to conceal or disguise."
§1956(a)(2)(B)(i). It seems far more likely that Congress
intended courts to apply the familiar criminal law con-
cepts of purpose and intent than to focus exclusively on
how a defendant "structured" the transportation. In addi-
tion, the structural meaning of "design" is both overinclu-
sive and underinclusive: It would capture individuals who
structured transportation in a secretive way but lacked
any criminal intent (such as a person who hid illicit funds
*en route* to turn them over to law enforcement); yet it
would exclude individuals who fully intended to move the
funds in order to impede detection by law enforcement but
failed to hide them during the transportation.

To be sure, purpose and structure are often related.
One may employ structure to achieve a purpose: For ex-
ample, the petty thief may hide money in his shoe to
prevent it from being detected as he crosses the border
with the intent to hide the money in Mexico. See 478 F.
3d, at 301 (Smith, J., dissenting). Although transporting
money in a conventional manner may suggest no particu-
lar purpose other than simply to move it from one place to
another, secretively transporting it suggests, at least, that
the defendant did not want the money to be detected
during transport. In this case, evidence of the methods
petitioner used to transport the nearly $81,000 in cash—
bundled in plastic bags and hidden in a secret compart-
ment covered with animal hair—was plainly probative of
an underlying goal to prevent the funds from being de-
tected while he drove them from the United States to

Mexico. The same secretive aspects of the transportation also may be circumstantial evidence that the transportation itself was intended to avoid detection of the funds, because, for example, they may suggest that the transportation is only one step in a larger plan to facilitate the cross-border transport of the funds. Cf. *id.*, at 289 (noting that "concealment of the funds during the U. S. leg of the trip [was] a vital part of the transportation design or plan to get the funds out of this country"). But its probative force, in that context, is weak. "There is a difference between concealing something to transport it, and transporting something to conceal it," *id.*, at 296–297 (Smith, J., dissenting); that is, *how* one moves the money is distinct from *why* one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter.

This case illustrates why: Even with abundant evidence that petitioner had concealed the money in order to transport it, the Government's own expert witness—ICE Agent Richard Nuckles—testified that the purpose of the transportation was to compensate the leaders of the operation.[7] Tr. 179 (Oct. 12, 2004), App. 64–65 ("[T]he bulk of [the money] generally goes back to Mexico, because the smuggler is the one who originated this entire process. He's going to get a large cut of the profit, and that money has to be moved back to him in Mexico"). The evidence suggested that the secretive aspects of the transportation were employed to *facilitate* the transportation, see 478 F. 3d, at 289 (noting that "concealment of the funds during the U. S. leg of the trip [was] a vital part of the transportation design or plan"), but not necessarily that secrecy was the *purpose* of the transportation. Agent Nuckles testified

————————

[7] Concealing or disguising a listed attribute need be only one of the purposes of the transportation. See §1956(a)(2)(B)(i) (providing that a transportation plan need be designed "in whole or in part" to conceal or disguise). But here, compensating the leaders of the operation was the only purpose to which Agent Nuckles testified.

that the secretive manner of transportation was consistent with drug smuggling, see Tr. 179–180, App. 65–66, but the Government failed to introduce any evidence that the reason drug smugglers move money to Mexico is to conceal or disguise a listed attribute of the funds.

Agent Nuckles also testified that Acuna, the Mexican border town to which petitioner was headed, has a cash economy and that U. S. currency is widely accepted there. See Tr. 188–189, App. 69. The Fifth Circuit apparently viewed this as evidence that petitioner transported the money in order to conceal or disguise it: "[G]iven Mexico's largely cash economy, if [petitioner] had successfully transported the funds to Mexico without detection, the jury was entitled to find that the funds would have been better concealed or concealable after the transportation than before." 478 F. 3d, at 292. The statutory text makes clear, however, that a conviction under this provision requires proof that the purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute. Although the evidence suggested that petitioner's transportation would have had the effect of concealing the funds, the evidence did not demonstrate that such concealment was the purpose of the transportation because, for instance, there was no evidence that petitioner knew about or intended the effect.[8]

----

[8] In many cases, a criminal defendant's knowledge or purpose is not established by direct evidence but instead is shown circumstantially based on inferences drawn from evidence of effect. See, *e.g.*, 1 W. LaFave, Substantive Criminal Law §5.2(a), p. 341 (2d ed. 2003). Specifically, where the consequences of an action are commonly known, a trier of fact will often infer that the person taking the action knew what the consequences would be and acted with the purpose of bringing them about. Although, as noted above, the Government introduced some evidence regarding the effect of transporting illegally obtained money to Mexico, the Government has not pointed to any evidence in the record from which it could be inferred beyond a reasonable doubt that petitioner knew that taking the funds to Mexico would have had

In sum, we conclude that the evidence introduced by the Government was not sufficient to permit a reasonable jury to conclude beyond a reasonable doubt that petitioner's transportation was "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." §1956(a)(2)(B)(i).

## III

The provision of the money laundering statute under which petitioner was convicted requires proof that the transportation was "designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control" of the funds. §1956(a)(2)(B)(i). Although this element does not require proof that the defendant attempted to create the appearance of legitimate wealth, neither can it be satisfied solely by evidence that a defendant concealed the funds during their transport. In this case, the only evidence introduced to prove this element showed that petitioner engaged in extensive efforts to conceal the funds *en route* to Mexico, and thus his conviction cannot stand. We reverse the judgment of the Fifth Circuit.

*It is so ordered.*

---

one of the relevant effects.

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–1456

_____

## HUMBERTO FIDEL REGALADO CUELLAR, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 2, 2008]

JUSTICE ALITO, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, concurring.

I join the opinion of the Court but write briefly to summarize my understanding of the deficiency in the Government's proof.

As the Court notes, *ante*, at 10, the Government was required in this case to prove that petitioner knew that the plan to transport the funds across the Mexican border was designed at least in part to "conceal or disguise the nature, the location, the source, the ownership, or the control" of the funds. 18 U. S. C. §1956(a)(2)(B)(i).

Transporting the funds across the border would have had the *effect* of achieving this objective if, once the funds made it into Mexico, it would have been harder for law enforcement authorities in this country (1) to ascertain that the funds were drug proceeds ("nature"), (2) to find the funds ("location"), (3) to determine where they came from ("source"), (4) to ascertain who owned them ("ownership"), or (5) to find out who controlled them ("control"). But as the Court notes, *ante*, at 15, the prosecution had to prove, not simply that the transportation of the funds from the United States to Mexico would have had one of these *effects*, *ibid.*, but that petitioner *knew* that achieving one of these effects was a *design* (*i.e.,* purpose) of the transportation.

As the Court also notes, *ante*, at 16, n. 8, a criminal defendant's intent is often inferred. Here, proof of petitioner's knowledge and of the intent of the person or persons who "designed" the transportation would have been sufficient if the prosecution had introduced evidence showing, not only that taking "dirty" money across the border has one or more of the effects noted above, but that it is commonly known in the relevant circles (that is, among those who design and carry out "such transportation," §1956(a)(2)(B)) that taking "dirty" money to Mexico has one of the effects noted above. Such evidence would permit a trier of fact to infer (1) that the person or persons who "designed" the plan to have the funds taken to Mexico intended to achieve the effect in question and (2) that a person like petitioner (that is, a person who is recruited to transport the funds) knew that this was the design.

Of course, if the prosecution had introduced such evidence, the defense could have countered with any available proof showing (1) that in fact the achievement of these effects was not a design of the transportation or (2) that petitioner in fact did not know that achieving one of these effects was a purpose of the plan. It would have then been up to the trier of fact to decide whether the statutory elements had been adequately proven.

At petitioner's trial, as the Court notes, *ante*, at 16, the Government introduced some evidence regarding the effect of transporting illegally obtained money to Mexico, but the Government has not pointed to any evidence in the record from which it could be inferred beyond a reasonable doubt that a person like petitioner knew that taking the funds to Mexico would have had one of the relevant effects. For this reason, I agree with the Court that petitioner's conviction cannot be sustained.